Good morning Mr. Paul. The court sees you were appointed under the Criminal Justice Act and wants to let you know I appreciate your willingness to accept the appointment. Thank you your honor. May it please the court. The government today seeks to avoid review by this court after a pattern of choosing not to seek warrants from independent magistrates and after failing to carry their burden at a suppression hearing. In the standing issue there's a conflation in the case law cited by the government between fraudulently obtaining a hotel room and using a pseudonym and I think that's very important. I think if you look through all of the different cases they've cited that's a that's a major theme where they were all fraudulently obtained and so that's when the court and these are all out-of-circuit courts. Specifically I'm looking at Diaz and Wu Kang I believe, maybe getting that name wrong, are the big ones. The only 8th Circuit court that the or 8th Circuit case that the government is relying on is Lewis and that's a mailbox case. We had a mailbox out in a rural road, it's not in the record in the case that I see, but I imagine like a gravel road there's a like a barrel and a mailbox. It does say that it was open to the weather. Government people, mail carriers are putting their hands in there and all the letters are addressed to somebody else. That was not a holding in the case but a footnote that they would have found that there was no standing. That's the 8th Circuit persuasive authority. Well on the first B&B they had checked out right? Yes your honor and there's... Boy doesn't that end any... and they go with the owner of the Airbnb so... I believe the record was is the owner went in independently and then the FBI came in because of the lock room which is worse for the appellant. I would say that the standing issue is clearly very very different between the Keokuk and the Minnesota. Proceed to the second one, go ahead. The Minnesota case is the one that I'm going to primarily be talking about. We would concede the standing issue on the Keokuk case. I think that's important factually as far as the pattern goes here. But in Minnesota, Mr. Black was an overnight guest. He had possessions there. The FBI during the suppression motion specifically said he could not say what credit card was used or whether it had Mr. Black's name on it or not. So there's no evidence that that was fraudulently obtained and so I think that that's really the standing issue that we have here. The Keokuk case, the record does not reflect those same things that indicate the expectation of privacy and that's just it's very different. However, I would say that it shows this... the government here is trying to get a categorical exigency. It's trying to say that when we're looking for a teenage girl, we have these risks that it's always an exigency. The FBI agent essentially said that during the suppression motion and you see that that's what they're relying on. There's a conflation also between the protective sweep and the exigency search in that Minnesota house, which I think is important and it comes back to the sort of the third argument and probably the most novel argument that the government failed to carry its burden because it has to show these specific exigencies. It has to show that that the protective sweep was in the scope and which type of protective sweep we're doing. Mr. Black was handcuffed and detained as well as AW during some of the searches. Again, the record is weak to this point and I would ask the court to hold that against the government here. Isn't there a little more to the exigent circumstances though than just a teenage? I mean, it's a teenage girl who's been missing for a period of time. They had information that your client and her were involved in some sexual activity and they knew that they were fleeing the FBI's investigation. They were moving around trying to avoid it. Yes, Your Honor. It seems to be a little more than just a teenage girl going on here. I would agree, Your Honor, that especially the fleeing, they had indications that AW was attempting to dodge the FBI. That's definitely in the record. I would say that there's evidence that Mr. Black had previously been involved in sex issues. The connection between the two of them is a little more complicated, especially given the multiple people that AW have been staying with and the information relied on, which was from other characters that was sort of unvetted, resulting from Facebook warrants. But yes, there's other evidence. But when the FBI agent is on the stand and he's asked, what's the exigency? He said, well, the first thing is that there's a 14-year-old girl we were looking for. I think that's really important here and I think that reveals sort of the subjective intent behind the FBI. I think that when you look at it, the FBI came in and they had these opportunities to put more meat on the bone as far as what the exigency was. Where did this protective sweep go? When did the protective sweep stop? When did the exigency begin? How long were they in there? What rooms did they proceed to? And none of that was provided. Seeing no further questions right now from the bench, I'm going to reserve the rest of my time. Thank you very much. Thank you. May it please the Court, Matthew Stone on behalf of the United States. Your Honors, starting with the standing issue, I would disagree with the characterization that this was just a fictitious name and not fraudulently obtained. The evidence that we have in this case, as testified to at the suppression hearing, and what was in the search warrant affidavit, and also in the PSR, is that Chris Black was unemployed and didn't have a job. And so we have a period of time here from mid-December until February 15th when they find him at the Airbnb. He's using two different names, Andre Sanchez for the Kiokuk Airbnb, and then Jason Gustafson for the Minneapolis Airbnb. And he's also making multiple reservations at the same time. So for the night, or on the February 15th, when they get information about this, he has reservations in Minneapolis, Rochester, Minnesota, and also Cedar Rapids, Iowa. And when you put those together with what had happened at Kiokuk, where he's also using a different name, he had used the Andre Sanchez profile in multiple different cities as well. I believe it was Iowa City, Des Moines, Ankeny, and Montrose, Iowa. There is no visible means of support for Mr. Black. And as Special Agent McMillan testified to at the suppression hearing, when he went through Mr. Black's phone, there's other evidence of identity theft. There's evidence of him accessing other people's accounts and other people's credit cards. And when he testified at the suppression hearing about the card that was used to secure the Kiokuk Airbnb, it was an Ohio credit card from a credit union that has no other ties to Mr. Black. So essentially in this case, all the evidence shows Mr. Black is both using a fictitious name and fraudulently obtaining these Airbnbs. And then even beyond that, he's, as the courts already noted, the whole purpose of doing this in this manner is to avoid law enforcement. I mean he's already spoken to after the Airbnb in Kiokuk on January 11th. He's already spoken directly to Special Agent McMillan. He's been informed that A.W. is a 14-year-old minor runaway. And after that, Christopher Black then tells other people the FBI is looking for her. I need to get her out of town because they're looking for her. Those same folks also noted that A.W. had hickeys on her neck and that she had also herself run away from the FBI when she saw them arriving at the Kiokuk Airbnb. So all of those things, the whole purpose of this is that he's using a fictitious name and fraudulently obtaining these Airbnbs to avoid law enforcement. This is not a legitimate subjective expectation of privacy that society is going to look at and say, yes, Chris Black has a subjective expectation of privacy that is objectively reasonable for this Airbnb when he's going to use it specifically to prey on a 14-year-old girl. Did the owner at Kiokuk say they checked out? How clear is the record on that? I cannot remember, Your Honor, if it actually was specifically that they had checked out at that point or if there just was nobody there. My recollection is that when Chris Black spoke to the FBI, he said that he had not been there since January 3rd, that he rented the Airbnb for somebody else, and that they had, and this was on January 5th, he had not been there for multiple days and I don't believe had any belongings there. But I can't remember if the the owner actually said specifically that they had checked out at that point. So I apologize, Your Honor. So again, we would ask the court to find that Christopher Black had no standing in either the Kiokuk or the Minneapolis Airbnb. As to the actual circumstances issue, again, as the court has already noted, there's multiple things going on here. Again, you have this very lengthy time period where A.W. has been missing. I believe the report came in in late December when Special Agent McMillan spoke with Christopher Black. He was able to kind of get the time frame that he had first been with her at about December 14th of 2021. So here we are, February 15th of 2022, and they're still trying to find her. That's when he gets the information about the Jason Gustafson Airbnb reservations, and then proceeds to send agents to multiple different cities to try and locate Christopher Black and A.W. They ultimately, on the night of the 15th, find them at the Minneapolis Airbnb. And as noted in both the search warrant and the suppression testimony, the FBI agents can only see them through a window. They're not able to get a full ID, and so they wisely wait till the next morning when it's full light outside, and they can get a better look at everybody, and then go back. And once they believe they have a positive identification, go knock on the door, and Christopher Black opens. They ask him when they detain him, is A.W. inside? He says yes, and they go inside basically for the purpose of making sure that A.W. is there, that she's not running away, that she's not destroying any evidence, and then making sure that there's nobody else in the residence. I think it's also important to note that when they spoke to the Keokuk Airbnb owner on the previous time, that the owner told them that there were two males that were there along with A.W., and so I think in this case there's reason for the FBI to act in this way, where there may be somebody else there. We also know that Chris Black has had multiple other encounters and investigations with other minors, so I think there's some reason to believe, you know, there may be somebody else besides A.W., another minor, or another adult who was in the residence at that time. So those are the reasons for the exit and circumstances, why they need to go in, and essentially all they did was secure the residence. They did note things that they saw when they went in to do so, but it's not like they conducted a full search or anything like that when they went in. They then, once A.W. was allowed to get her clothing removed from the residence, and then they actually they do exactly, you know, what they're supposed to do, which is get a search warrant, and then go back in and do a full search of the residence, his vehicle, and his person, which leads to that. I would say if the court finds that Chris Black has standing, or finds that there is not enough for the exit and circumstances in this case, there is more than enough probable cause in the search warrant if you remove the search from the Keokuk or from the Minneapolis Airbnb. Essentially that comes down to one sentence about a razor from Keokuk, which really doesn't kind of shift anything either way, or one sentence in one paragraph about the Minneapolis Airbnb, where they talk about finding stained bedding and sex toys and electronic devices. Given the history in this case, where you have the runaway and then what the FBI had learned from other law enforcement agencies, specifically Burlington, who had told them that Chris Black had been the subject of investigation into a missing 17-year-old girl. Burlington had also learned from the Lee County, Iowa Sheriff's Office that Christopher Black had been trying to get 12 to 16-year-old girls to go to hotel rooms, possibly to film them, and maybe giving juveniles drugs as well. They also learned from the Adam County Sheriff's Office in Illinois that Christopher Black was the subject of investigation into a child pornography case, where a cell phone had been left behind at a burglary investigation. When they downloaded it, they found selfies of Chris Black at the residence and they also found numerous images of child pornography. So given that he's with the 14-year-old girl, who as I mentioned earlier, had been seen with Chris Black on multiple occasions, had hickeys on her weaknesses, that Chris Black was actively hiding her from the police, and what they knew his proclivities were, that all of that together, as Special Agent McMillan said at this pressure hearing, he was going to get a search warrant for, you know, Chris Black and the residents and anything else that he was connected with for these reasons. Because you're looking for electronics, because he's had child pornography before, you're looking for him filming something because that's what he was accused of doing before. All these things had been part of previous investigations. So there's more than enough probable cause for the search warrants to have been issued, even if you remove the parts that were seen from the the Minneapolis Airbnb. And then finally, we have good faith and with the Canon case, the United States versus Canon case that we cited, that doesn't apply only if it's clearly illegal. And given the circumstances of the case where the FBI is very rapidly searching for a runaway minor who may be used with somebody who's suspected to be a sex offender, it's really hard to believe this circumstance would qualify as clearly illegal to any of these FBI agents where they're going in to secure a minor to then secure the residents for a search warrant that is then done. So I don't see, unless the court has any other questions, I will see the rest of my time. Thank you, Mr. Stone. Thank you. So as far as the Leon exception goes, I believe that counsel of the government sort of laid out our argument why this is not a Leon case. And that's because they're attempting to rely on this categorical exigency. There is clear case law that there's no categorical exigency. So if we find, so Leon can't save them. This is clearly illegal based on the exigency because that was what they were relying on. I want to talk a little bit about Minnesota. Specifically, I want to say that there was overnight surveillance here. There were people watching. They knew how many people were there. This is not your typical executing an arrest warrant protective sweep. The FBI here had much more information that undermines one of the two types of protective sweeps that they were doing. Again, it's either with an arrest or within the immediate, the scope goes down if they're not executing an arrest warrant. So Mr. Black was not arrested at this point. He was detained, as was AW. So they have AW and Mr. Black in handcuffs and we know that. We don't know a lot about what's going on. Again, we don't know where they went. We don't know if there were multiple searches. It does appear from the suppression motion that the government went back in to secure clothing. I would also point out that during the suppression, Agent McMillan of the FBI stated that a lot of the information he was providing was from a conversation he had on the phone the day before. So the government in its brief talks about the lack of a hearsay objection during the suppression motion. This is not a hearsay issue that we're raising. This is essentially a sufficiency of the evidence issue for the suppression. I will admit that there's not a lot of case law on this, but we know there must be some level of persuasive evidence provided. And we know that when an agent is testifying to things he's getting the day before, arm's length, months after, not relying directly on reports but relying on a conversation, that undermines the strength of the evidence. And it's the government's burden here to whichever type of search was going on. The government needs to show also that the scope in Minnesota was within whichever type of search they were in at the time. The record simply doesn't support that. There is evidence that in the PSR, I don't know that there was evidence presented at the suppression motion regarding previous identity theft. There was in the search warrant, but I don't know if that's being relied on. But the agent specifically said he could not say that Mr. Black did not purchase this with a credit card with his name on it legally. And when we're talking about the expectation of privacy, it's specific to this residence, to this place that he's staying overnight where he has his stuff, where he's sleeping. And so I would say that all of that evidence is not appropriate to undermine the expectation of privacy. As far as we know, he had the same expectation of privacy as a normal hotel guest. He also, during the suppression, and there's no further evidence of this, what the R&B terms and conditions are. Whether they're guaranteeing who is staying there is the person that they're saying. Whether they're allowed to sublet as the Keokuk is alleged to have done, whether that breaks the rules. And all of that would go to the expectation of privacy somebody has. Mr. Paul, just one quick question. I just want to make sure that I heard you correctly in your opening argument in response to Judge Benton. Did you say that essentially you concede the standing question with respect to Keokuk? Yes, Your Honor. Okay, thank you. Yes. And again, the reason why is because it's just such a different case. We don't have him as an overnight guest. Just going back to Keokuk, I don't think that this is really important to the case, but there was reports that AW escaped through that locked room. The agent during the suppression undermined that. Again, so we do have evidence that she was fleeing. I don't think that is some of that evidence. Going to the search warrant and whether it's adequate, I would say that the problem here is that the scope of the search warrant to those electronic devices and the fact that it was not just the Minnesota residents, but to those devices is a problem because those devices were identified as well as the sex toys during these searches. And that's why the scope is wrong on the search warrant. Thank you, Your Honor. Thank you, Mr. Paul. The court appreciates both counsel's appearance and briefing and argument. The case is now submitted and we'll issue an opinion in due course. I believe that completes our argument calendar for the week. So the court will be in recess until further call.